UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ELECTRIC INSURANCE COMPANY, ) )  Plaintiff, ) ) v. ) ) GREAT SOUTHERN FINANCIAL CORP., ) d/b/a GREAT SOUTHERN AGENCY, ) ) Defendant. ) ) | Civil Action No. 14-14172-FDS |

**MEMORANDUM AND ORDER ON**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This is a civil action arising out of a contract dispute between an insurance company and an insurance agent that sold the company's products. In 2010, pursuant to an agency agreement with plaintiff Electric Insurance Company, defendant Great Southern Agency ("GSA") sold a homeowner's insurance policy to an individual named Jerry Bull in Missouri. Two years earlier, Bull's previous house had been destroyed by a fire, and he received a significant insurance payout from a different insurance company. Bull then applied for a new policy from Electric through GSA. In obtaining an individualized price quote for the policy from Electric's web portal, a GSA employee falsely represented that Bull had not suffered a fire loss in the previous three years. The GSA employee also failed to collect and retain Bull's insurance application, a requirement under the agency agreement. Electric nonetheless issued the policy.

In 2012, Bull's new house suffered substantial fire damage. Without an insurance application on file to determine whether Bull had made misrepresentations sufficient to void the

policy, Electric was obligated to pay more than $500,000 to cover Bull's damages.

After conducting an investigation and paying out the policy, Electric brought suit against GSA for breach of contract, contractual indemnity, negligent misrepresentation, and violation of Mass. Gen. Laws ch. 93A.

Electric has moved for summary judgment on all four claims. Viewing the record in the light most favorable to GSA and drawing all reasonable inferences in its favor, a jury could reasonably conclude that Electric would have issued the insurance policy to Bull and suffered a loss even if GSA had not misrepresented Bull's prior fire loss, and even if GSA had not failed to retain Bull's application. In other words, the summary judgment record does not establish as a matter of law that GSA's actions or inactions caused Electric to issue the policy and suffer damages as a result. Accordingly, plaintiff's motion for summary judgment will be denied.

## I.   Background

### A.   Factual Background

Except where otherwise noted, the following facts are either undisputed or taken in the light most favorable to the non-moving party GSA.

#### 1.   The Parties

Plaintiff Electric Insurance Company is a Massachusetts-based underwriter of home and auto insurance. (Compl. ¶ 1). Missouri-based Great Southern Agency is owned by Great Southern Financial Corp.—itself a subsidiary of Great Southern Bank Corp.—and sells insurance-related products. (*Id.* at ¶ 2; Pl. SMF ¶ 24).[1] Great Southern Bank, also a subsidiary

---

[1] The referenced statement of material facts submitted by Electric ("Pl. SMF") includes undisputed facts, as well as GSA's response to disputed facts. (Docket No. 45). The Court has also considered GSA's statement of additional disputed material facts ("Def. SMF"). (Docket No. 42).

of Great Southern Bank Corp., offers banking products, including mortgage loans.  (Pl. SMF ¶ 24).

### 2. The Agency Agreement

From May 6, 2009, through January 15, 2013, GSA was an insurance agent for Electric in Missouri pursuant to an agency agreement.  (*Id.* at ¶ 1).  GSA sold, among other products, homeowner's insurance policies that were underwritten by Electric.  (*Id.*).  The parties do not dispute that the agency agreement was a valid contract governed by the laws of Massachusetts.[2]

Under the "Authority to Sell and Obligations of Agency" section of the agreement, GSA was

> [a]uthorized to sell insurance to qualified applicants that meet [Electric's] pre-determined underwriting and marketing criteria as provided in the program guidelines within the territory upon receipt of the deposit premium.  All insurance sold by [GSA] shall be sold in accordance with this agreement and the program guidelines.

(Compl. Ex. A, Agency Agreement ¶ 2.1).  Under the agreement, not only did GSA agree to sell insurance policies in accordance with Electric's program—or underwriting—guidelines, but it was also obligated to obtain policy quotes from Electric in accordance with those guidelines. (*Id.* at ¶ 2.2).  The agreement defined Electric's "Program Guidelines" as "written or machine readable rules, regulations, underwriting guidelines, rates, forms and instructions that have been or will be provided by [Electric] to [GSA] and that relate to the solicitation, sale, pricing, and/or servicing of insurance."  (*Id.* at ¶ 1.10).

Under section 2.3 of the agreement, GSA could sell Electric's insurance policies only if it "procured completed and executed Application Materials and the appropriate premium down-payment from an applicant."  (Pl. SMF ¶ 6; Agency Agreement ¶¶ 2.3, 2.15, 22).  The agreement

---

[2] The "agreement is entered into and shall be governed by the laws of the Commonwealth of Massachusetts."  (Compl. Ex. A, Agency Agreement ¶ 21).

defined application materials to include an insured's "insurance policy application." (Agency Agreement ¶ 1.1). The agreement also required GSA to "maintain policyholder documents in its possession on file in accordance with the program guidelines"; those "policyholder documents" included not only application materials, but also "all written correspondence received from the insured, or written notes [GSA agents] derived from conversations with the insured." (*Id.* at ¶ 22).

The agreement authorized GSA to use producers, or "licensed insurance agents," to sell Electric's insurance products. (*Id.* at ¶ 1.9). GSA agreed to ensure that "producers . . . compl[ied] with all applicable terms, conditions, and limitations of th[e] agreement and the program guidelines pertaining to the exercise of such authorities and rights or the discharge of such duties and obligations as if such terms, conditions, and limitations were binding on producers." (*Id.* at ¶ 3.1).

Specifically, the agreement required GSA to "ensure that producers (i) sell insurance in compliance with th[e] agreement (Section 2.1) . . . [and] (ii) obtain application materials and appropriate premium down payments (Section 2.3) . . . ." (*Id.*). GSA further agreed that it "shall be fully and solely responsible for ensuring that each producer used by [GSA] complies with all applicable terms, conditions and limitations of this agreement as if such terms, conditions and limitations were binding on such producer." (*Id.* at ¶ 3.2). It also assumed responsibility "to take all steps necessary to ensure that each of the producers ha[s] received appropriate training with respect to the sale and servicing of insurance." (*Id.* at ¶ 15).

The agreement contained an indemnification clause, under which GSA agreed to

> indemnify, defend, and hold harmless [Electric] . . . from and against any and all losses, obligations, costs, liabilities, damages, actions, suits, causes of action, claims, demands, settlements, judgments, or any other expenses, including but not limited to attorneys' fees and expenses, which are asserted against, imposed upon

or incurred or suffered by [Electric] and which arise out of or result from:

> (i) The failure of [GSA] or any of its respective . . . employees or agents to properly discharge any of their duties or obligations under or to observe or comply with all terms, conditions and limitations contained in this agreement pertaining to their authority or rights hereunder;
>
> (ii) The breach or failure to observe any covenant, conditions, warranty, representation, or limitation contained in this agreement by agency or any of its respective . . . employees or agents;
>
> (iii) The violation of any law, rule, regulation, order, or other legal authority in connection with this agreement by [GSA] or any of its . . . employees or agents;
>
> (iv) The negligence, gross negligence, or willful or wanton behavior in connection with this agreement by [GSA] or any of its respective . . . employees or agents.

(*Id.* at ¶ 7.1).

### 3. The Bull Policy

On January 10, 2008, Jerry Bull's house in Missouri was at least partially destroyed by fire. (Bull Aff. ¶¶ 2-3). At the time, Bull had a homeowner's insurance policy, and the insurance company accepted the claim and covered the costs of the damage. (*Id.* at ¶ 3). After the fire, Bull purchased a new house in Billings, Missouri. (*Id.* at ¶ 4). He lived in the house with his wife, four children, three cats, and two dogs. (*Id.* at ¶¶ 12-13). Bull used a woodstove in the house, and he also stored guns in it. (*Id.* at ¶¶ 14-15).

In 2010, Bull sought to refinance the mortgage on his new house. (*Id.* at ¶ 7). He met with Donna Winslow, an employee of GSB, who informed him that he needed to obtain homeowner's insurance before closing on the loan. (Winslow Aff. ¶¶ 2, 9-12). Winslow explained GSB's affiliation with GSA to Bull, and asked him whether he wanted a homeowner's insurance policy quote from GSA. (*Id.*). Bull assented, and Winslow served as his primary

contact for not only the mortgage refinancing, but also for the homeowner's insurance policy. (*Id.* at ¶¶ 10-12).

Winslow faxed a "quote request" to GSA. (*Id.* at ¶ 9). On September 30, 2010, Stacy Jensen, a GSA insurance agent who was authorized to sell insurance policies underwritten by Electric, received the quote request. (Def. Second Amended Suppl. Interrog. No. 7). She entered Electric's web portal in order to obtain a homeowner's insurance policy quote to send to Bull. (*Id.*). As explained below, the parties dispute whether Electric had programmed its web portal to execute its 2010 underwriting guidelines, as well as whether certain guidelines were binding on Electric's underwriting officers. Nonetheless, the parties do not dispute that the web portal required GSA agents to answer certain questions about the applicant in order to calculate a quote.

Jensen did not speak with Bull before answering the questions in the web portal. (*Id.*). She entered the following information into Electric's web portal:

1. Bull had not suffered an insurance loss in the previous three years;
2. Bull had been insured by the same insurance company for five consecutive years;
3. Bull's house did not have a woodstove;
4. Bull lived in his house with only his wife;
5. Bull had no animals in the house; and
6. Bull had no firearms in the house.

(Michalowski Aff. ¶ 20). After Jensen answered the questions in Electric's web portal, Bull received an annual premium quote of $632 and he agreed to purchase the insurance policy in

order to close on the refinancing loan. (Bull Aff. ¶ 9).[3]

On October 7, 2010, Jensen mailed Bull an Electric homeowner's insurance policy application for him to complete, sign, and return. (Def. Suppl. Interrog. Answer No. 7). The application included, among other things, questions about prior insurance losses, the number of people and animals residing in the house, and whether the applicant had firearms or a woodstove in the house. (Michalowski Aff. ¶ 32).

The parties dispute whether Bull returned or even received the application; they also dispute whether he answered its questions truthfully even if he returned it to GSA.[4] Nonetheless, GSA admits that it did not collect and/or retain Bull's application. (Def. Interrog. Answer No. 9). GSA also admits that it never notified Electric about Bull's 2008 fire loss, his woodstove, firearms, or animals. (*Id.*; Pl. SMF ¶ 61).[5]

About two years after Bull purchased the Electric homeowner's policy through GSA, his new house suffered severe fire damage. On November 28, 2012, Electric learned of the fire, and its claims department discovered a news article reporting that Bull had suffered a total fire loss to his previous home in 2008. (Pierce Aff. ¶ 4).

Electric requested a copy of Bull's insurance application from GSA, but GSA could not provide it. (*Id.* at ¶ 5). Electric then hired an investigator to take recorded statements from Bull and his wife; both admitted that their previous house suffered a fire loss in 2008, that they lived

---

[3] It is unclear whether GSA's Jensen communicated the quote directly to Bull, or if she sent the quote to GSB's Winslow, who then relayed it to Bull.

[4] Bull believes that he received the application, answered all of the questions honestly and accurately, and mailed the application back to GSA. (Bull Aff. ¶ 11). However, he has twice conceded that he cannot definitively remember receiving or completing the application. (Def. Exs. 12, 15).

[5] The parties dispute whether GSA or GSB knew about Bull's 2008 fire loss. Bull maintains that he told GSB about the 2008 fire after he received the quote. (Bull Aff. ¶ 9). However, GSA has put forth evidence disputing that fact, and Electric concedes that the Court should not consider it for summary judgment purposes. (Pl. SMF ¶¶ 30-31).

in their house with four children and five animals, and that they had a woodstove and firearms in their house. (*Id.* at ¶¶ 6-7).

Without Bull's application on file, Electric determined that it could not void his policy, and it paid him $533,030.58 to satisfy the claim. (Pl. SMF ¶ 73).

### 4. Electric's Underwriting Guidelines

The parties vigorously dispute whether Electric's 2010 underwriting guidelines allowed GSA to sell homeowner's insurance policies to applicants who had suffered one or more fire losses during the previous three years.

Electric contends that its web portal was the exclusive location for its 2010 underwriting guidelines and that the guidelines were programmed into the interactive portal. (Michalowki Aff. ¶¶ 7-10). It also contends that its guidelines automatically rejected a homeowner's insurance application from a non-General Electric employee who had suffered any fire loss in the previous three years. (Michalowski Aff. ¶¶ 7-10).[6] Furthermore, the web portal was, according to Electric, programmed to increase the quoted annual premium if an applicant had a woodstove or firearms in the house, if he had animals, or if there were additional residents, such as children. (*Id.* at ¶¶ 13-16). Electric has also presented evidence that Ashley Vincent, an Electric manager, trained GSA's Stacy Jensen on the guidelines and clearly notified her that Electric would not underwrite a new homeowner's insurance policy if the applicant had a prior fire loss within three years of the application. (Vincent Dep. 37:22-38:13).

Vincent also testified that when she trained GSA agents like Jensen, she notified them that

- Electric required GSA to collect and retain signed insurance applications, even

---

[6] Electric at one time was affiliated with General Electric, and it apparently treated applications from GE employees differently.

> though a GSA agent could obtain a quote and even bind coverage before executing the application;
>
> - GSA agents were required to notify Electric if an individual supplied new, relevant information in his application; and
>
> - GSA agents were required to discuss insurance loss history with applicants and accurately report that information to Electric.

(*Id.* at 60:6-15, 137:3-10, 140:13-22).

In sum, Electric contends that if GSA had notified Electric that Bull had suffered a fire loss in 2008, then it would not have issued a quote to Bull through the web portal, would not have made an exception to its underwriting guidelines, and would have avoided paying for Bull's claim. (Michalowski Aff. ¶¶ 20-26). In the alternative, Electric contends that "aside from [its] underwriting eligibility guidelines, if true answers to [the questions that Jensen answered falsely in the web portal] had been provided to Electric and Electric had decided to bypass the automatic disapproval of the application, its premium rating guidelines would have generated a quote for an annual premium in the amount of $1,125, rather than $632 . . . and Mr. Bull likely would not have elected to" pay for such a policy. (Pl. Mem. 10) (citing Bull Aff. ¶ 19; Michalowski Aff. ¶ 27).

In opposition, GSA points to an Electric "Product Overview" that was effective July 3, 2010, and that Electric distributed to GSA's agents when training them. (Michalowski Dep. 21:15-23:8). The Product Overview listed Electric's "key declines," which included "[m]ore than one theft, fire, or plumbing loss" in the past three years. (Def. Ex. 1 at 5). Electric stated that its agents could "rely on [the Product Overview] as a guide to know whether or not they should pursue certain quotes with Electric." (Michalowski Dep. 41:23-24). GSA also presented

evidence suggesting that Electric's underwriters had discretion to override a declination by the web portal for a prior fire loss (*See id.* at 81:14-82:10, 83:12-84:8, 159:20-160:1), and that GSA's agents knew that they could contact Electric's underwriters for an override. (Vincent Dep. 45:18-47:1).

GSA also highlights Electric's concession that it issued a policy to at least one non-GE employee who had a prior fire loss over $10,000 within three years of his application. (Michalowski Aff. ¶ 26; Michalowski Dep. 162:18-166:4). It has also presented evidence that Electric's underwriters, in considering whether to override a declination by the web portal, would weigh factors such as how long ago the fire had occurred (within the three-year period), whether the applicant's negligence partly caused the fire, and whether the size of the applicant's policy fell within Electric's target policy size of over $200,000. (Michalowski Dep. 164:19-165:15, 168:2-10, 173:7-16). Finally, GSA notes that Electric renewed Bull's policy three times: once in 2011 when an independent adjustor reviewed the exterior and interior of the home after a wind loss (and presumably would have seen the children, animals, and woodstove), once in 2012, and once in 2013 even after Electric had learned of the fire loss. (Michalowki Dep. 182:1-185:12, 186:1-187:14, 189:13-22).

### B.     **Procedural Background**

On November 14, 2014, Electric filed a complaint against GSA alleging claims for negligent misrepresentation, breach of contract, contractual or express indemnity, and violation of Mass. Gen. Laws ch. 93A.  Before the close of discovery, Electric moved for summary judgment on all four of its claims.

## II. <u>Legal Standard</u>

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making that determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id*. at 256-57.

## III. <u>Analysis</u>

Electric contends that the undisputed facts demonstrate that GSA is liable for negligent misrepresentation, breach of contract, and violation of Chapter 93A as a matter of law, and that it is therefore entitled to indemnification under the agency agreement. In response, GSA essentially concedes that it committed multiple breaches of the agency agreement and that its employee negligently misrepresented Bull's 2008 fire loss. However, it contends that it has

presented facts sufficient to dispute whether its actions caused, as a matter of law, Electric to suffer damages. The Court will address each of Electric's four claims in turn.

### A.     Negligent Misrepresentation

In order to prove the tort of negligent misrepresentation under Massachusetts law, a plaintiff must establish that a defendant

> (1) in the course of [its] business, or in a transaction in which [it] had a pecuniary interest, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance on the information, and that [it] (6) failed to exercise reasonable care or competence in obtaining or communicating the information.

*DeWolfe v. Hingham Centre, Ltd.*, 464 Mass. 795, 799-800 (2013); *see also AECOM Tech. Servs. Inc. v. Mallinckrodt LLC*, 117 F. Supp. 3d 98, 108 (D. Mass. 2015); Restatement (Second) of Torts § 552 (1977).

Electric contends that GSA's agent Jensen failed to exercise reasonable care by entering the six false answers into its web portal to obtain Bull's policy quote. Furthermore, it contends that Jensen's misrepresentations caused its loss under two independent theories. First, it contends that "Bull was not eligible for the policy and would not have been issued the policy if Electric were aware of the truth about his prior fire loss within three years." (Pl. Mem. 19). Second, it contends that even if it did not automatically reject Bull's policy based on the prior fire loss, he "likely would have rejected the policy if the premium was $1,125, as it should have been, instead of $632." (*Id.*).

GSA does not dispute that Jensen supplied false information, nor does it present evidence sufficient to dispute that she acted without reasonable care or competence. For example, GSA concedes that Jensen did not even speak to Bull before obtaining a quote, agreeing to bind coverage, and sending him a follow-up application. However, it contends that the evidence

"supports a finding by the trier of fact that Electric would have issued a policy to Mr. Bull even had it known of the prior fire loss." (Def. Mem. 11).

Viewing the evidence in the light most favorable to GSA and drawing all reasonable inferences on its behalf, the Court cannot conclude as a matter of law that Jensen's misrepresentations caused Electric's loss—that is, that they caused Electric to underwrite the policy. The evidence presented by GSA raises at least some doubt as to whether Electric would have issued Bull a policy even if it had known of his 2008 fire loss.

Beginning with Electric's first theory of causation, Electric's own Product Overview stated that "[m]ore than one theft, fire, or plumbing loss" in the previous three years was a "key decline," not an absolute bar. (Def. Ex. 1 at 5). Electric also concedes that it trained GSA's agents by using the Product Overview, and that those agents could, at least in part, rely on that document. As to the web portal, it appears that Electric's underwriters had discretion to override a declination by the web portal for a prior fire loss. Furthermore, Electric had previously issued at least one policy to a non-GE employee who had suffered a fire loss within three years of his application. Finally, regardless of its reasons for doing so, Electric renewed Bull's policy even *after* it learned of Bull's second fire loss in 2012. Accordingly, the Court cannot conclude as a matter of law that but for Jensen's misrepresentations, Electric would not have issued Bull an insurance policy.

Electric's second theory of causation—that but for Jensen's misrepresentations, it would have issued a higher quote to Bull and he would have declined it—also requires the resolution of disputed facts. Notably, Electric contends that Bull "likely" would not have purchased the policy if the premium was higher. However, it appears that Bull paid a premium of $1,408 when Electric renewed his policy after the 2012 fire. (Michalowski Dep. 200:22-203:18). That

13

premium is higher than the supposed $1,125 premium that Electric contends Bull would have been quoted—and would have declined—had Jensen not failed to disclose his 2008 fire loss. Ultimately, of course, a jury may resolve that disputed fact in Electric's favor. Nonetheless, the Court cannot grant Electric's motion for summary judgment simply because a jury is "likely" to resolve a disputed fact in its favor.

Viewing the evidence in the light most favorable to GSA, the Court cannot grant summary judgment for Electric on the inherently factual issue of causation. Accordingly, Electric's motion for summary judgment on its negligent misrepresentation claim will be denied.

### B.     Breach of Contract

In order to prevail on summary judgment for breach of contract in Massachusetts, a plaintiff must prove beyond dispute "that there was a valid contract, that [defendant] breached its duties under the contractual agreement, and that the breach caused [plaintiff] damage." *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 316 (D. Mass. 1997) (citations omitted); *see also Szulik v. State Street Bank and Trust Co.*, 935 F. Supp. 2d 240, 267 (D. Mass. 2013) (noting that a plaintiff's breach of contract claim requires proof of a "causal connection" between the defendant's breach and its own damages). There is no dispute that the agency agreement between Electric and GSA was a valid contract.

Electric contends that it should be granted summary judgment on its breach of contract claim under two distinct theories. First, it contends that GSA breached the agency agreement by entering six material misrepresentations about Bull's prior losses into the web portal, and by issuing a policy in violation of Electric's underwriting guidelines. (*See* Agency Agreement ¶ 1.10) (requiring the agency to sell insurance in compliance with Electric's "written or machine readable rules, regulations, [and] underwriting guidelines"). Second, it contends that GSA

breached the agency agreement by failing to collect and/or retain a signed application from Bull. (*See id.* at ¶ 22) (requiring the agency to "maintain policyholder documents in its possession on file in accordance with the program guidelines," including all "application materials").[7]

Beginning with Electric's first theory, GSA essentially concedes that Jensen's six misrepresentations violated the agency agreement. However, GSA contends that Jensen's misrepresentations did not cause Electric's loss because Electric would have issued the policy to Bull even if it had been aware of his prior fire loss. As with Electric's negligent misrepresentation claim, there appears to be insufficient undisputed evidence to conclude that, as a matter of law, GSA's breach caused Electric to suffer damages. Many material facts concerning causation are disputed, including whether Electric's web portal housed its complete underwriting guidelines in 2010, whether the "Product Overview" conflicted with the web portal; whether Electric agents could override the web portal and issue a policy to an applicant with a fire loss during the prior three years; and whether such an override occurred in this case. In short, there are simply too many disputed facts for the Court to conclude as a matter of law that GSA's misrepresentations in the web portal caused Electric to issue the Bull policy and suffer damages.

Electric's second theory warrants a more detailed explanation. It contends that GSA's failure to collect and/or retain Bull's application prevented it from voiding Bull's policy and avoiding losses (in the event that Bull misrepresented the 2008 fire on his application). Electric's reasoning appears to be as follows: that Bull suffered a fire loss in 2008, and Electric

---

[7] Electric also asserts a third breach-of-contract theory. It contends that Bull, after receiving the quote, thought that the premium seemed low and called GSB's agent to confirm that the quote included his 2008 fire loss. (Pl. Mem. 18). It contends that the agent violated her duty to update Electric about Bull's prior fire loss. However, Electric has conceded that "GSA has produced evidence . . . sufficient to permit an inference that there is a genuine issue of dispute as to this [fact] and therefore this [fact] should not serve as a basis for the entry of summary judgment." (Pl. SMF ¶¶ 30-31).

did not learn of that loss until he suffered his 2012 loss; Electric then asked GSA for Bull's policy application to determine whether he made a misrepresentation that could void his policy; GSA could not produce the application; Electric could not void the policy; and as a result Electric suffered damages.

However, the causal chain from GSA's breach (not retaining Bull's application) to Electric's damages (being unable to void the policy) is more attenuated than Electric suggests. The chain depends on two disputed facts that could result in three possible scenarios, and as explained below, one of those scenarios does not prove causation as a matter of law.

The first disputed fact is whether Bull lied on (or even submitted) his policy application. In his affidavit, Bull states that he remembers receiving a policy application, and would have filled it out accurately, including the disclosure of his 2008 fire loss. However, in statements to GSA, he conceded that he could not definitively conclude that he received the application, or that he submitted it. The second disputed fact is whether Electric automatically denied policy applications from individuals who suffered a fire loss within the previous three years, and whether that denial was final.

In the first scenario, GSA's breach would clearly cause Electric's damages. If Bull lied on his policy application, GSA's failure to retain his application would prevent Electric from voiding the policy. The second scenario—where causation would also be established as a matter of law—is if Bull disclosed his 2008 fire loss on his application *but* Electric's underwriting guidelines explicitly prevented GSA from selling a policy to an applicant who experienced a fire loss in the previous three years. In that scenario, if GSA had collected and retained the policy application, Electric would be able to recover from GSA for selling insurance in violation of the underwriting guidelines. In both those scenarios, Electric would have been able to avoid

damages but for GSA's failure to retain Bull's application.

However, in the third scenario, Electric would suffer damages regardless of GSA's failure to retain Bull's application. If Bull completed the application truthfully (first disputed fact) *and* Electric's underwriting guidelines did not automatically prevent issuing a policy to an applicant with a fire loss in the previous three years (second disputed fact), GSA's failure to maintain the application would be irrelevant to damages. In other words, even if GSA *did* retain Bull's application, Electric still would have suffered a loss in that scenario; it would not have been able to void the policy (because Bull answered the application truthfully), and it would not have been able to recover from GSA for selling insurance in violation of the agreement (because the Product Overview prevented selling policies to applicants with *more* than one fire loss). Based on the current record and those two key disputed facts, Electric may have suffered damages even if GSA did not breach the agreement by failing to retain Bull's application. Therefore, causation remains a disputed factual issue for a jury to decide.

In sum, the remaining disputed facts prevent the Court from concluding as a matter of law that GSA's breach—its failure to retain Bull's application and its misrepresentations in the web portal—caused Electric to suffer damages. Accordingly, Electric's motion for summary judgment on its breach of contract claim will be denied.

### C. **Express Indemnification**

Under Massachusetts law, where material facts are not in dispute, interpretation of an indemnity clause is an issue of law. *Caldwell Tanks, Inc. v. Haley & Ward, Inc.*, 471 F.3d 210, 215 (1st Cir. 2006). Indemnification clauses are "to be interpreted like any other contract, with attention to language, background, and purpose." *Herson v. New Bos. Garden Corp.*, 40 Mass. App. Ct. 779, 782 (1996). Such clauses "are to be fairly and reasonably construed in order to

ascertain the intention of the parties and to effectuate the purpose sought to be accomplished." *Post v. Belmont Country Club, Inc.*, 60 Mass. App. Ct. 645, 651 (2004) (quoting *Shea v. Bay State Gas Co.*, 383 Mass. 218, 222 (1981)).  Unambiguous contract language must be "interpret[ed] according to its plain terms." *Bank v. International Bus. Machs. Corp.*, 145 F.3d 420, 424 (1st Cir. 1998) (internal quotation marks and citations omitted). "If those plain terms unambiguously favor either side, summary judgment is appropriate." *Id.*

However, if the application of an indemnity clause depends on one or more antecedent material facts in dispute, a claim for express indemnification is not properly resolved at the summary judgment stage.  Electric effectively concedes that it must prevail on one of its other three claims for the Court to award it summary judgment on its express indemnification claim. (*See* Pl. Mem. 13) ("Under the express terms of the agreement, Electric's right to contractual indemnity is triggered by a showing that Electric sustained losses resulting from or arising out of a breach of the agreement, a showing of negligence or gross negligence, or a violation of law, such as [Mass. Gen. Laws ch. 93A]."); (*see also* Agency Agreement ¶ 7.1) (providing that Electric is entitled to indemnification for losses which "arise out of or result from" some breach, negligence, or other misrepresentation by GSA).

The plain terms of the agency agreement's indemnification clause require causation, which is a disputed issue of fact for the reasons discussed above.  Accordingly, because the indemnification clause is triggered only if certain disputed material facts—specifically, those concerning causation—are resolved in a certain way, the Court cannot conclude as a matter of law that Electric is entitled to indemnification at this time.  Electric's motion for summary judgment on its claim for express indemnification will therefore be denied.

D.      **Chapter 93A**

A defendant is liable under Chapter 93A if it engages in an "unfair method of competition" or an "unfair or deceptive act or practice." Mass. Gen. Laws ch. 93A, § 11. To trigger liability under Chapter 93A, the conduct in question must fall within "'the penumbra of some common-law, statutory, or other established concept of unfairness' or [be] 'immoral, unethical, oppressive or unscrupulous.'" *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 40 (1st Cir. 2000) (quoting *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 769 (1st Cir. 1996)). "A mere breach of contract does not constitute an unfair or deceptive trade practice under 93A, unless it rises to the level of commercial extortion or a similar degree of culpable conduct." *Id.* (citations and internal quotation marks omitted). For example, "an insurance carrier 'which in good faith denies a claim of coverage on the basis of a plausible interpretation of its insurance policy is unlikely to have committed a violation of [Chapter 93A].'" *Id.* (quoting *Gulezian v. Lincoln Ins. Co.*, 399 Mass. 606, 613 (1987)).

"A ruling that conduct violates [Chapter] 93A is a legal, not a factual, determination." *Incase, Inc. v. Timex Corp.*, 488 F.3d 46, 56 (1st Cir. 2007) (quotation omitted). Even so, the First Circuit has also explained that "whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact." *Id.* at 57. Thus, liability under Chapter 93A depends upon antecedent factual findings, which the Court is unable to make at this stage because critical facts—such as whether GSA acted in good faith by attempting to retain Bull's application or trying to follow the underwriting guidelines—remain disputed. Moreover, Electric has not established that it is entitled to summary judgment on either its breach of contract claim or its negligent misrepresentation claim.

Accordingly, Electric's motion for summary judgment on its Chapter 93A claim will be denied.

## IV. Conclusion

For the foregoing reasons, plaintiff Electric Insurance Company's motion for summary judgment is DENIED.

**So Ordered.**

|  |  |
|---|---|
|  | /s/ F. Dennis Saylor |
|  | F. Dennis Saylor IV |
| Dated: April 13, 2016 | United States District Judge |